**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OUR CHILDREN'S EARTH
FOUNDATION, and ECOLOGICAL
RIGHTS FOUNDATION; ECOLOGICAL
RIGHTS FOUNDATION,
            *Plaintiffs-Appellants,*

                v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL O.
LEAVITT, Administrator of EPA;
STEVEN L. JOHNSON,
            *Defendants-Appellees,*

ASSOCIATION OF METROPOLITAN
SEWERAGE AGENCIES; EFFLUENT
GUIDELINES INDUSTRY COALITION;
THE UTILITY WATER ACT GROUP
(UWAG); NATIONAL
ASSOCIATION OF CLEAN WATER
AGENCIES (NACWA),
            *Defendant-Intervenors-*
                *Appellees.*

No. 05-16214

D.C. No.
CV-04-02132-PJH

ORDER AND
OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
February 13, 2007—San Francisco, California

Filed May 23, 2008

Before: J. Clifford Wallace, Dorothy W. Nelson, and
M. Margaret McKeown, Circuit Judges.

5983

Opinion by Judge McKeown

**COUNSEL**

Christopher Sproul, Environmental Advocates, San Francisco, California, for the appellant.

Sue Ellen Wooldridge, Assistant Attorney General, Washington, DC, for the appellees.

Fredric P. Andes, Carolyn S. Hesse, and David T. Ballard, Barnes & Thornburg, L.L.P., Chicago, Illinois, for intervenor-appellee Effluent Guidelines Industry Coalition.

David W. Burchmore and Jill A. Grinham, Squire, Sanders, & Dempsey L.L.P., Cleveland, Ohio, for intervenors-appellees Association of Metropolitan Sewerage Agencies, now known as National Association of Clean Water Agencies.

Melanie Shepherdson, National Resources Defense Counsel, Washington, DC, amicus in support of the appellants.

Jeffrey Odefey, Waterkeeper Alliance, Tarrytown, New York, amicus in support of the appellants.

**ORDER**

The petition for panel rehearing is granted. The petition for rehearing en banc is denied as moot.

The opinion filed October 29, 2007, slip op. 14215, and appearing at 506 F.3d 781, is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit. It is replaced by the concurrently filed opinion.

## OPINION

McKEOWN, Circuit Judge:

In 1972 Congress passed the Clean Water Act ("CWA" or "the Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *See* Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act of 1972), Pub. L. No. 92-500, 86 Stat. 816 (1972) (codified at 33 U.S.C. § 1251(a)). Central to that legislation and later amendments is the notion that pollution discharges would be controlled through technology-based effluent limitations.

Environmental advocates, Our Children's Earth Foundation and Ecological Rights Foundation (collectively "OCE"), filed this citizen suit under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, alleging that the Environmental Protection Agency ("EPA" or "the Agency") has failed to fulfill its mandate to review effluent guidelines and limitations in a timely manner and in accord with technology-based standards. Specifically, OCE claims that EPA violated its statutorily-mandated duties by abandoning *technology-based* review in favor of *hazard-based* review; neglecting to identify *new* polluting sources; and failing to publish timely plans for future reviews. *See* CWA § 301(b), 33 U.S.C. § 1311(b); CWA § 301(d), 33 U.S.C. § 1311(d); CWA § 304(b), 33 U.S.C. § 1314(b); CWA § 304(m), 33 U.S.C. § 1314(m).[1]

---

[1] Sections of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, are conventionally cited using the sections of the original Act, rather than the section numbers assigned after codification in the U.S. Code. We follow that convention here. The first time we cite to a provision of the Act, we include a preliminary parallel citation to the U.S. Code. All citations are to the CWA unless indicated otherwise.

A technology-based approach to water quality focuses on the achievable level of pollutant reduction given current technology, whereas a hazard-based[2] approach seeks to identify known hazards or contaminants in the water and to reduce the prevalence of those hazards. *See, e.g.*, S. Rep. No. 92-414, at 8 (1971), 1972 U.S.C.C.A.N. 3668, 3674-78. Although these approaches are not mutually exclusive, OCE claims that EPA jettisoned a technology-based approach altogether, thus abdicating its statutory duties.

The district court granted judgment in favor of EPA, holding that the challenged acts or omissions were discretionary. We agree that the decisions whether to revise the effluent guidelines and whether to incorporate technology-based criteria in its periodic review of the guidelines fall within EPA's discretion. Consequently, we affirm.

## BACKGROUND

OCE's amended complaint contains four claims alleging non-compliance with what OCE characterizes as EPA's mandatory duties under the Act:

(1)   EPA failed to review effluent guidelines based on the "best conventional pollutant technology" ("BCT") and "best available technology" ("BAT"), as mandated by §§ 304(b), (m);

(2)   EPA failed to review existing effluent limitations as required by §§ 301(b), (d);

(3)   EPA failed to issue timely final effluent guidelines plans as required by § 304(m)(1); and

---

[2]Hazard-based regulation is also referred to in the record as water-quality-based and harm-based regulation.

(4) EPA failed to identify *new* polluting sources as required by § 304(m)(1)(B).

In sum, OCE argues that the CWA requires, as a non-discretionary matter, that the Agency take a particular approach to water safety regulation: technology-based review, published in a sufficiently timely fashion to afford a meaningful opportunity for notice and comment. EPA and Intervenors Effluent Guidelines Industry Coalition and Association of Metropolitan Sewerage Agencies (now known as the National Association of Clean Water Agencies) (together, "Intervenors") counter that EPA's non-discretionary duties do not extend to a particular manner of performing reviews and revisions.

We first address the argument by EPA and the Intervenors that this suit was not properly brought under the citizen suit provision of the Act, § 505(a), 33 U.S.C. § 1365(a)(2), but rather should have been brought under § 509(b)(1), 33 U.S.C. § 1369(b)(1). Then, we consider whether the district court has jurisdiction over each of OCE's four claims under § 505(a)(2). Because § 505(a)(2) jurisdiction is predicated on citizen enforcement of a non-discretionary duty, our analysis focuses on whether the claims relate to discretionary or non-discretionary duties under the Act.

## ANALYSIS

### I.   JURISDICTION TO REVIEW AGENCY ACTION[3]

---

[3]The Agency's position on jurisdiction is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1038-39 (D.C. Cir. 2002) ("Nor is an agency's interpretation of a statutory provision defining the jurisdiction of the court entitled to our deference under *Chevron*.") (citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)).

**[1]** The CWA contains two separate jurisdictional sections: § 505(a), known as the citizen suit provision, and § 509(b)(1), which relates primarily to challenges to promulgation of certain standards and determinations. OCE brought suit under § 505(a)(2), which permits "any citizen [to] commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."[4] CWA § 505(a)(2).

**[2]** Alternatively, § 509(b)(1) permits suits against the EPA Administrator for review of action

> (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(l). . . .

Suits brought pursuant to § 509(b)(1) must be filed directly

> in the Circuit Court of Appeals of the United States for the Federal judicial district in which [petitioner] resides or transacts business. . . . Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issu-

---

[4]OCE's amended complaint also cites the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, as an alternative basis for jurisdiction, but does not allege any claims under the APA.

ance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

CWA § 509(b)(1). Section 509(b)(1) actions, as opposed to suits brought under § 505(a)(2), challenge the exercise of the Administrator's discretion in promulgating standards and issuing determinations.

**[3]** So long as EPA's challenged acts and omissions relate to non-discretionary duties under the Act, OCE's action was properly brought in the district court under § 505(a)(2). To the extent OCE challenges actions within the discretion of the Administrator, the district court properly refused to exercise jurisdiction under § 505(a)(2). Nonetheless, a jurisdictional defect under § 505(a)(2) does not mean that jurisdiction is proper under § 509(b)(1).

"[T]his Court has counseled against expansive application of section [509(b)]." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1190 n.8 (9th Cir. 2002). Section 509(b)(1) covers only challenges to "promulgation" or "approval" or "determinations" on permits, not failure to comply with allegedly mandated procedures, which is the thrust of OCE's suit.

Additionally, § 509(b)(1) lists a number of sections for which review obtains in the court of appeals: §§ 301, 1312, 304(*l*), 1316, 1317, 1342, and 1345. Neither §§ 304(b) or 304(m) is referenced in § 509(b)(1). Because the challenge here does not stem from the promulgation or approval of an effluent limitation or permit, we need not decide whether § 509(b) encompasses a challenge under § 304. *Compare E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 136-37 (1977) (suggesting that the EPA could collapse the limitations to be promulgated under §§ 301 and 304 into a single review), *with Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1310 (9th Cir. 1992) (holding that the sections listed in § 509 are

sufficiently specific that unlisted sections should not be interpreted to be covered by § 509).

**[4]** We thus agree with the district court that the circuit court's exclusive jurisdiction "extends only to a substantive review of the appropriateness of the guidelines actually promulgated, and not to the threshold question of whether the statutory requirements of the CWA have been met." No such promulgated guidelines or limitations are at issue here. The district court had jurisdiction under § 505(a)(2) to determine whether EPA discharged its non-discretionary duties under the CWA.

## II.   TECHNOLOGY-BASED REVIEW AND REVISION

In determining whether OCE's four claims challenge non-discretionary obligations under the Act, our point of reference is the statute itself. Although the line between a congressional mandate and an area of agency discretion is not difficult to state, ascertaining that line is not always as easy. When Congress specifies an obligation and uses the word "shall," this denomination usually connotes a mandatory command. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001). On the other hand, "[a]bsent some provision requiring EPA to adopt one course of action over the other, we can only conclude that EPA's choice represented an exercise of discretion." *Farmers Union Cent. Exch. v. Thomas*, 881 F.2d 757, 761 (9th Cir. 1989).

However, not every decision is so easily categorized. As the Supreme Court teaches, the decision-making process does not necessarily collapse into a single final decision. "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997). In *Bennett*, considering a citizen suit provision parallel to that in the CWA, the Supreme Court held, "[s]ince it is the omission of these *required* procedures

that petitioners complain of, their . . . claim is reviewable." *Id.* at 172 (emphasis added).

With these general principles in mind, we consider the CWA provisions relevant to each of OCE's claims to determine whether the particular claim relates to a mandatory obligation or discretionary agency function under the Act.

## A.   HISTORY OF THE CWA AND TECHNOLOGY

By way of brief overview, when the CWA was enacted in 1972, its stated goal was the elimination of all discharges of pollutants into the nation's waters by 1985. *See* CWA § 101(a)(1); 33 U.S.C. § 1251(a)(1). This goal was to be accomplished through ambitious technological improvements, because the previous water-quality based approach to pollutant control had been "limited in its success." S. Rep. No. 92-414, at 8 (1971), 1972 U.S.C.C.A.N. at 3675. In the CWA's Declaration of Goals and Policy, Congress wrote, "it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans." CWA § 101(a)(6).

The CWA formally prohibits the "discharge of any pollutant" from any source into navigable waters except when authorized by a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). *See* CWA § 301(a). NPDES permits, issued either by the EPA, or by the states in a federally-approved permitting system, are statutorily required to set forth, at the very least, "effluent limitations"—that is, certain "restriction[s] . . . on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged . . . into navigable waters." *Waterkeeper Alliance, Inc. v. EPA,* 399 F.3d 486, 491 (2d Cir. 2005) (citing *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004)).

The specific effluent limitations contained in each NPDES permit are determined by the terms of more general "effluent limitation guidelines," which are separately promulgated by the EPA. The effluent limitations and the guidelines have long been understood to be determined according to the best available or practicable technology. *See E.I. du Pont de Nemours & Co.*, 430 U.S. at 121 (explaining the technology-based character of effluent limitations and guidelines); *see also Waterkeeper Alliance*, 399 F.3d at 491 ("[Effluent Limitation Guidelines], and the effluent limitations established in accordance with them, are technology-based restrictions on water pollution. They are technology-based, because they are established in accordance with various technological standards that the Act statutorily provides . . . .").

Since 1972 Congress has amended the CWA on a number of occasions. In the 1985 amendments, Congress reaffirmed its commitment to a technology-based approach to water quality regulation:

> The technology-based approach to water pollution control was adopted in 1972 because of the historical ineffectiveness of the previous water-quality-based approach. This approach failed because of uncertainties about the relationship between pollutant loadings and water quality and the association between water quality and health and environmental effects. There are still significant gaps in knowledge of these relationships. Consequently the reported bill reaffirms the technologically-based approach established in 1972 as an immediate and effective method of achieving the goals of the Act.

S. Comm. on Env't & Pub. Works, 99th Cong., Report to Accompany S. 1128 (1985 Clean Water Act Amendments) 3-4 (Comm. Print 1985).

## B. THE STATUTORY FRAMEWORK

**[5]** Three key statutory provisions of the CWA are at issue here: §§ 301(d), 304(b) and 304(m). Section 301(d) requires EPA to review, every five years, the effluent limitations established under § 301(b)(2) and to revise such regulations "if appropriate." These processes are undergirded by a series of mandated criteria stating what the regulations "shall" contain. The mandated criteria include technology-based requirements. *See* CWA § 304. Sections 304(b) and (m) require an annual review of "guidelines for effluent limitations" applicable to direct dischargers and revision "if appropriate." As in § 301, § 304(b) includes mandated criteria that reference technology-based requirements, without differentiating between application of these criteria to promulgation, review or revision. Section 304(m) specifically provides for a schedule for review of the guidelines in accordance with § 304(b).

According to EPA, rather than conducting separate reviews, it consolidates effluent limitations required under § 301(d) into effluent limitation guidelines under § 304(b). As EPA puts it: "through its annual review of its consolidated 'effluent limitation guidelines' EPA also reviews the effluent limitations they contain, thus meeting its review requirements under § 301(d) and § 304(b) simultaneously."

## C. CRITERIA FOR REVIEW AND REVISION

It is undisputed that EPA has an obligation to review effluent guidelines and limitations for possible revision, and that such a review is mandatory. It is also undisputed that EPA's ultimate decision *whether* to revise the guidelines and limitations is discretionary, as "appropriate." And, it is undisputed that any revision must be in accord with detailed statutory criteria that incorporate variants of the best-technology standard. What remains in dispute is whether, as part of its mandated *review* process, EPA must consider the technology-

based criteria. To address this question, we consider the statute itself.

**[6]** The Act imposes on EPA non-discretionary duties to review its current effluent limitations guidelines regulating the pollutants discharged into the nation's waters, and, "where appropriate," to revise them, according to the criteria in the statute. *See* CWA §§ 301(d); 304(b), (m). Under § 304(b), "the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of October 18, 1972, regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations." The statute goes on to provide that "[s]uch regulations shall" conform to specific criteria. The requirement of a technology-based approach to promulgation and revision of regulations runs throughout the statutory text of § 304(b).

Section 304(b)(1)(A) states:

> Such regulations shall—identify . . . the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources . . . .

CWA § 304(b)(1)(A).

Section 304(b)(1)(B) relates that the regulations "shall":

> specify factors to be taken into account . . . relating to the assessment of best practicable control technology currently available . . . includ[ing] consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the

> application of various types of control techniques
> . . . . and such other factors as the Administrator
> deems appropriate.[5]

CWA § 304(b)(1)(B).

Section 304(b)(2)(A) continues to mandate a technology-based approach, without differentiating between promulgation and revision:

> regulations shall . . . identify, . . . the degree of efflu-ent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and proce-dure innovations . . . .

CWA § 304(b)(1)(A).

Section 304(b)(4)(A) yet again requires an analysis in terms of "application of the best conventional pollutant control tech-nology . . . ." Each of the subsections of § 304(b) includes a mandatory requirement related to technology.

**[7]** Under § 304(m), EPA also has an obligation to publish a biennial plan announcing a schedule for performing the annual review and for establishing rules regarding any exist-ing effluent guideline selected for possible revision as a con-sequence of the annual review. Section 304(m)(1) states in full:

> (m)   Schedule for review of Guidelines

---

[5]This last phrase, "and such other factors as the Administrator deems appropriate," indicates, as OCE acknowledges, that the EPA could adopt additional factors for consideration, including harm or risk-based factors. The discretion to consider additional factors does not, however, render the mandatory factors optional.

(1)    Publication

Within 12 months after February 4, 1987, and biennially thereafter, the Administrator shall publish in the Federal Register a plan which shall—

(A)    establish a schedule for the annual review and revision of promulgated effluent guidelines, in accordance with subsection (b) of this section [specifying technology-based factors];

(B)    identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) of this section and section 1316 of this title have not previously been published; and

(C)    establish a schedule for promulgation of effluent guidelines for categories identified in subparagraph (B), under which promulgation of such guidelines shall be no later than 4 years after February 4, 1987, for categories identified in the first published plan or 3 years after the publication of the plan for categories identified in later published plans.

CWA § 304(m)(1).

In § 301, which deals with the five year review and revision of effluent limitations, Congress wrote: "Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, *if appropriate*, revised pursuant to the procedure established under such paragraph." CWA § 301(d) (emphasis added). The cross-referenced subsection (b)(2) mandates the application of technology-based criteria in determining the applicable effluent limitations.

For example, § 301(b)(2)(A) states that effluent limitations for categories other than publicly-owned treatment works

"shall require application of the best available technology economically achievable . . . ." The mandated technology-based criteria run throughout the text of § 301(b). *See, e.g.*, CWA § 301(b)(1)(A) ("[E]ffluent limitations . . . shall require the application of the best practicable control technology currently available . . . ."); § 301(b)(2)(E) ("[P]ollutants identified . . . shall require application of the best conventional pollutant control technology . . . .").

The plain language of these provisions reflects that the CWA repeatedly mandates a technology-based approach as a non-discretionary matter in the promulgation of the regulations, at least as one methodology among others. Further, the statute makes clear that the regulations must comport with technological criteria that change over time. The statutory language is unambiguous that *revision* decisions, although discretionary as indicated by the "if appropriate" language, are constrained by the statute's mandate as to what "such regulations" "shall" accomplish. The statute states that the regulations "shall" account for the technological factors without distinguishing between promulgation and revision.

**[8]** Nonetheless, while the overall structure of the Act strongly suggests that any *review* to determine whether revision is appropriate should contemplate the mandatory technology-based factors, the statute does not expressly and unequivocally state as much. Nothing in the CWA specifically obligates the EPA to *review* the effluent guidelines and limitations using a technology-based approach. At most, the statutory provisions and legislative history are ambiguous.

**[9]** To compel agency action under § 505(a)(2), a citizen suit must point to a nondiscretionary duty that is "readily-ascertainable" and not "only [ ] the product of a set of inferences based on the overall statutory scheme." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987). The legislative and regulatory maze presented here do not meet that standard. Nor would it be appropriate for us to divine a "specific,

unequivocal command," *see Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004), from an amalgamation of disputed statutory provisions and legislative history coupled with the EPA's own earlier interpretation. *See* Preliminary Effluent Guidelines Plan for 2004-2005, 68 Fed. Reg. 250, 75515 (EPA Dec. 31, 2003). Finally, we do not invoke the *Chevron* analysis here because we are not trying to determine whether we should defer to the EPA's interpretation of the statute, but are trying to determine whether, objectively, the statute creates a mandatory duty. In sum, the statute falls short of imposing a mandatory duty and thus the review criteria are not properly before the court under § 505(a)(2).

### III.   Publication Schedule Proposed by OCE

**[10]** Section 304(m) requires biennial publication of a plan for scheduling annual review and revision of the guidelines. The plan must provide for public review and comment prior to final publication. *See* CWA § 304(m)(2). OCE argues that the plan should be synchronized with the annual review, but as the district court correctly held, the Act does not require this degree of harmonization.

**[11]** The statute requires only that the EPA abide by the time limitations requiring biennial publication. Nowhere does the statute require that the EPA synchronize its publication with the calendar year. OCE objects that use of the word "plan" implies that it be published before the described events take place. Although this argument has logical appeal, it is insufficient to trump the text of the statute.

**[12]** As long as the EPA meets the statutorily-prescribed deadlines, and affords opportunity for notice and comment, it has satisfied its mandatory duties under § 304(m). The publication schedule preferred by OCE is not mandated by the statute, and thus is not amenable to challenge under § 505(a)(2).

## IV.   Identification of New Polluting Sources

OCE also argues that EPA has failed to identify new categories of industry discharging toxic and nonconventional pollutants not covered by existing effluent guidelines. The district court found that in 2005 EPA identified only two new sources for which no guidelines then existed. According to OCE, following EPA's 2003 review, EPA proposed not to schedule promulgation of any new effluent guidelines.

[13] Under § 304(m)(1)(B), the Administrator "shall" devise a plan which "shall—identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) of this section and section 1316 of this title have not previously been published." The Administrator is also required to schedule publication of effluent guidelines for the categories identified under § 304 (m)(1)(B). *See* CWA § 304(m)(1)(C).

[14] The statute does not require that the Administrator identify *all* or *any* existing categories of sources, only that the Administrator identify currently unregulated categories. The Senate Committee Report on the 1985 Amendments states: "Guidelines are required for any category of sources discharging significant amounts of toxic pollutants. In this use, 'significant amounts' does not require the Administrator to make any determination of environmental harm; any non-trivial discharges from sources in a category must lead to effluent guidelines." S. Comm. on Env't & Pub. Works, 99th Cong., Report to Accompany S. 1128 (1985 Clean Water Act Amendments) 25 (Comm. Print 1985). The Senate Committee Report suggests that it is at least within the discretion of the Administrator to determine whether particular discharges are non-trivial, and hence require new effluent guidelines.

[15] While the identification of new categories is a non-discretionary duty, the precise number and kind of such categories identified is discretionary with the Administrator. The

statutory language does not command otherwise. Since EPA did identify two new categories of sources during the period in question here, OCE's challenge to the sufficiency of new source identification is not properly brought under § 505(a)(2).

### V. MOTION TO TRANSFER

After filing a notice of appeal to this court, OCE filed a motion to transfer its claims to this court as if they were originally filed here under § 509(b)(1). The district court did not abuse its discretion in refusing to transfer claims to this court after the notice of appeal had been filed. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam) (holding that once a notice of appeal is filed, the district court is divested of jurisdiction over the matter being appealed); *see also Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (a challenge to the district court's refusal to transfer claims under 28 U.S.C. § 1631 is reviewed for an abuse of discretion).

### CONCLUSION

The district court properly dismissed OCE's claims regarding the manner and timing of review of the guidelines, the scheduling of plan publication and identification of new polluting sources, and did not abuse its discretion in refusing to transfer OCE's claims to this court.

**AFFIRMED**. Each party shall bear its own costs on appeal.